**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **JAMES F. LYNCH** | : | **Crim. No. 07-431-1** |

**DEFENDANT JAMES LYNCH'S SUPPLEMENTAL SUBMISSION IN SUPPORT OF MOTION TO VACATE**

For the reasons stated in Defendant James Lynch's *pro se* Motion to Vacate Judgment under 28 U.S.C. § 2255, And In The Alternative For A Writ Of Coram Nobis under 28 U.S.C. § 1651(a) (filed December 16, 2010), and those stated herein, Defendant James Lynch respectfully requests that the Court vacate his conviction for conspiracy to commit honest services fraud. Mr. Lynch's conviction must be vacated because it is based on a theory of honest services fraud that is constitutionally invalid after Skilling v. United States, ___ U.S. ___, 130 S. Ct. 2896 (2010).

**APPLICABLE STANDARDS**

Mr. Lynch filed his *pro se* Motion to Vacate Conviction under both 28 U.S.C. § 2255 and 28 U.S.C. § 1651(a). Since his filing, his supervised release has terminated, meaning that the Court is likely to rule that he is no longer "in custody" for purposes of § 2255. Obado v. New Jersey, 328 F.3d 716, 718 (3d Cir. 2003) (per curiam) (holding that continuing restitution

payments do not put the defendant "in custody").[1]  Without waiving any aspect of his claim for

relief, Mr. Lynch will focus in this filing on the standards governing his Motion for a Writ of

Coram Nobis vacating the conviction.

Coram nobis is the proper vehicle for correcting errors of a fundamental character.

United States v. Osser, 864 F.2d 1056, 1059 (3d Cir. 1988).  In addition to a fundamental error, a

petitioner whose sentence has ended must show that he is suffering from continuing

consequences of an invalid conviction.  A petitioner must also show that the remedy he seeks

was unavailable at the time of trial, and that he has "sound reasons" for failing to seek relief

earlier.  United States v. Stoneman, 870 F.2d 102, 106 (3d Cir. 1989).  Mr. Lynch meets all of

those standards.

**ARGUMENT**

**I.      A CONVICTION OF CONDUCT THAT IS NOT CRIMINAL IS ERROR OF A
        FUNDAMENTAL CHARACTER.**

The Third Circuit recognizes that "an assertion that a conviction was based on conduct

not covered by a criminal statute class is of a 'fundamental character'" for purposes of coram

nobis relief.  Osser, 864 F.2d at 1059.  Mr. Lynch pled guilty to conspiring to commit honest

services fraud based on an undisclosed conflict of interest.  After Skilling, that conduct is no

longer criminal.  Thus, Mr. Lynch has shown fundamental error.

---

[1]      The Obado case specifically addressed restitution payments, but in *dicta* applied the same
rule to payments toward a fine.  As explained further below, Mr. Lynch continues to make
payments on his fine, and the Probation Office referred his case to the Financial Litigation Unit
of the United States Attorney's Office for collection action if necessary.  See Petition of U.S.
Probation Office On Supervised Release, Docket Entry # 50; ordered by the Court on December
22, 2010.  Because Obado mentioned fines only in *dicta*, Mr. Lynch wishes to preserve for the
record the question of whether his continued payments and the referral to the U.S. Attorney's
Office mean that he is "in custody" for purposes of § 2255.

A.    **Skilling v. United States**

The Supreme Court's decision in Skilling v. United States, ___ U.S. ___, 130 S. Ct. 2896 (2010), pared back the sweeping boundaries of "honest services fraud" to its "solid core" of bribes and kickbacks.

In 1987 the Supreme Court ruled that the federal mail fraud statute, 18 U.S.C. §1341, criminalized only schemes to defraud a victim of tangible property.  McNally v. United States, 483 U.S. 350, 360 (1987).  Congress quickly moved to legislatively overrule McNally by enacting the honest services fraud statute, 18 U.S.C. § 1346.  Section 1346 is a definitional section that brings "the intangible right to honest services" within the reach of §1341 and its companion wire fraud statute, 18 U.S.C. §1343.  See Skilling, 130 S. Ct. at 2926-27.

Congress's action launched a round of litigation in which courts struggled mightily to confine the potentially-limitless reach of the concept of "honest services."  The Third Circuit settled upon an interpretation that confined honest services fraud to two theories:  (1) bribery, which is a *quid pro quo* exchange of a thing of value for an official action; or (2) failure to disclose a conflict of interest resulting in personal gain, while taking discretionary action to benefit that interest.  United States v. Kemp, 500 F.3d 257 (3d Cir. 2007) (defining bribery under § 1346); United States v. Panarella, 277 F.3d 678, 690 (3d Cir. 2002) (Becker, J.) (defining the conflict of interest theory under § 1346).  Other circuits adopted similar formulations. Eventually the Supreme Court granted *certiorari* in three cases, including Skilling, to resolve several issues about the contours of the honest services fraud statute, including the statute's very constitutionality.[2]

Implementing its mandate to "construe, not condemn" a statute if possible, the Skilling

---

[2]    The other cases were Black v. United States, 130 S. Ct. 2963 (2010) and Weyhrauch v. United States, 130 S. Ct. 2971 (2010).

Court declined to strike down §1346 as unconstitutionally vague.  Skilling, 130 S. Ct. at 2928.

Yet recognizing the due process problems threatened by novel applications of the flexible phrase

"honest services fraud," Skilling confined §1346 to its "solid core" of bribes or kickbacks.  Id. at

2930.  That is, Skilling construed § 1346 to place undisclosed conflicts of interest outside its

reach.  Id. at 2932-33.  What is known in this circuit as a "Panarella theory" of honest services

fraud – the failure to disclose a conflict of interest, while taking discretionary action to benefit

that interest – is not criminal conduct after Skilling.  The government has conceded, in other

matters pending in this district, that Skilling applies retroactively.  E.g., Government

Memorandum in Opposition to Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct

the Sentence, at 17, United States v. Mariano, Crim. No. 05-614, Civ. No. 09-4272 (E.D. Pa.)

(docket entry # 284).  Mr. Lynch gets the benefit of Skilling even though his conviction predated

the decision.

### B.      The Charges Against Mr. Lynch

The government took the position, in discussions with the defense that preceded Mr.

Lynch's Motion, that Mr. Lynch cannot prevail on collateral attack without demonstrating actual

innocence of bribery.  The government's position depends on the assumption that Mr. Lynch was

charged with a bribery theory of honest services fraud.[3]  The record shows that he was not.

A month before Mr. Lynch's change of plea hearing, the Third Circuit ruled that honest

services fraud bribery requires a *quid pro quo*, "a specific intent to give or receive something of

---

[3]      It also depends on the assumption that the Court will apply Bousley v. United States, 523
U.S. 614 (1998) to Mr. Lynch's Motion.  Yet if the Court adjudges Mr. Lynch ineligible for
relief under § 2255 and proceeds under coram nobis only, then Bousley (which is a § 2255 case)
does not apply.

value *in exchange* for an official act." <u>Kemp</u>, 500 F.3d at 281.[4]  The <u>Kemp</u> court explicitly

distinguished a bribe from a "reward" and from a "general attempt to curry favor":

> [B]ribery requires a *quid pro quo*, which includes an "intent to
> influence" an official act, or "to be influenced" in an official act.
> This may be contrasted to both a gratuity, which may constitute
> <u>merely a reward</u> for some future act that the public official will
> take (and may already have determined to take), or for a past act
> that he may already have taken, and to a noncriminal gift extended
> to a public official merely to build <u>a reservoir of goodwill that
> might ultimately affect one or more of a multitude of unspecified
> acts</u>, now and in the future.  This discussion is equally applicable
> to bribery in the honest services fraud context, and we thus
> conclude that bribery requires a specific intent to give or receive
> something of value *in exchange* for an official act.

<u>Id.</u> (internal citations and most quotations omitted, emphasis in original).  Yet the Information,

the Government's Plea Memorandum, and the prosecutor's statements at the plea hearing all

show that Mr. Lynch was charged only with a theory that <u>Kemp</u> places squarely <u>outside</u> bribery.

The Information filed in this case is not, it must be said, a model of clarity.  Admittedly,

it contains the phrase "bribes, rewards, gifts, loans, and other benefits."  Information, attached

hereto as Exhibit A, at ¶ 3.  But the Information enumerates this laundry-list of "benefits" only

to say that Mr. Lynch was "unlawfully rewarded and influenced" by them.  <u>Id.</u>  That allegation is

at best an amalgam of distinct standards contained in statutory provisions that Mr. Lynch was not

charged with violating – and it does not charge *quid pro quo* bribery.[5]  <u>Id.</u>  Moreover, any

---

[4]      The Assistant United States Attorney who prosecuted this case was trial counsel in <u>Kemp</u>
and on the briefs in that appeal.  Certainly he understood the import of <u>Kemp</u>, and spoke with
care when he described the charged conduct in terms that distinguish it from bribery.

[5]      Specifically, "corruptly . . . accepts [a benefit]. . . with intent to be influenced or
rewarded" is the language of 18 U.S.C. § 666.  The Department of Justice consistently takes the
position – including in an appeal currently pending before the Third Circuit, <u>United States v.
Bryant</u>, No. 09-3243 and 09-3275; and in its opposition to the defendant's § 2255 motion in
<u>United States v. Mariano</u>, Crim. No. 05-614, Civ. No. 09-4272 (E.D. Pa.), at 31 (docket entry #
284) – that § 666 permits conviction on a gratuity theory and does not require proof of intent to
effectuate a *quid pro quo* exchange.  Thus the government cannot contend here that this charging

ambiguity in that language was resolved by the specific *actus reus* that the Information identifies: it accuses co-defendant James Campanella of seeking to "illegally reward and influence [Mr. Lynch] through a corrupt payment"; and Mr. Lynch of "[taking] official actions benefitting [Mr. Campanella] and his businesses," "without disclosing the corrupt payment and recusing himself as he was required by local and state law to do." Id. at ¶¶ 9-10. The charging language directed at Mr. Lynch is a pure Panarella theory of honest services fraud: failing to disclose a conflict of interest resulting in personal gain, while taking discretionary action to benefit that interest. See Panarella, 277 F.3d at 694.

The burden is on the government to give fair notice in the charging document of the accusations that the defendant must meet. Fair notice is none the less important in the guilty plea context, in which the integrity of the Rule 11 colloquy depends upon the defendant understanding what the government would have to prove were he to exercise his right to go to trial. Nothing in the Information gave adequate notice that it charged a *quid pro quo* bribe. Nor does it appear that the government subjectively intended to charge bribery. To the contrary, in its Plea Memorandum the government summarized the factual basis for the plea this way:

> Campanella gave Lynch approximately $20,000 in cash as a
> reward for the assistance provided by Lynch and to maintain his
> relationship with Lynch when the need for assistance arose in the
> future. Lynch failed to disclose this payment as he was required to
> do.

Government's Guilty Plea Memorandum, attached hereto as Exhibit B, at 3-4 (emphasis added). Under Kemp, the "reward" language clearly signals a gratuity, and the "maintain his relationship" language clearly signals what Kemp calls "a general attempt to curry favor."

---

language, taken from § 666, properly charged a bribery theory of honest services fraud. Honest services fraud bribery does require a *quid pro quo* exchange, which the Information does not allege.

Kemp, 500 F.3d at 281.  Neither a gratuity nor "currying favor" rises to the level of the *quid pro quo* exchange that defines bribery.  And in any event, those allegations relate only to Mr. Campanella's state of mind.  As to Mr. Lynch himself, the government alleged that he failed to disclose the payment, and continued taking action to benefit Mr. Campanella rather than recusing himself.

As set forth in detail below, the prosecutor firmly adhered to that view at the plea hearing.  Mr. Lynch, for his part, made abundantly clear that he was pleading guilty only because he understood that he was not charged with bribery.

The charging document alleged against Mr. Lynch a now-invalidated Panarella theory of honest services fraud, and at most a gratuity theory that has never been cognizable under § 1346.[6]  The Court should not require Mr. Lynch to demonstrate his actual innocence of a crime with which he was never charged.

###    C.    Mr. Lynch's Guilty Plea

Informed by his own strong sense of what he had – and had not – done wrong, Mr. Lynch made abundantly clear at his plea hearing that he was admitting only a conspiracy to commit Panarella-type honest services fraud.  In fact, during his plea colloquy he repeatedly and explicitly denied "sell[ing] the job out," as detailed below.

The plea hearing unfolded as follows.  Judge Giles, then presiding over this matter, told Mr. Lynch that if he went to trial the government would have to prove

> That you were employed by the City, that you had a duty to the

---

[6]    Thus, if the Court holds that the Information did charge Mr. Lynch with conspiracy to commit honest services fraud bribery, then Mr. Lynch asserts – and respectfully requests an opportunity to demonstrate – that his guilty plea to the Information was not knowing and voluntary, and that his trial counsel was ineffective for advising him to plead guilty.

> City of loyalty, and that means honest services, and that you knowingly accepted monies from someone who was attempting to do business with the City through you or with your assistance, knowing that that money was intended to influence you in the performance [of] your official duties.[7]

Transcript of Change of Plea Hearing, attached hereto as Exhibit "C," at 9:21-10:2. In response, the defense clarified that Mr. Lynch had not solicited a payment from Mr. Campanella, and had not known what it was when it was delivered. Id. at 10:4-17.

After the rest of the Rule 11 colloquy, the government recited the factual basis for the plea. The prosecutor adopted the defense's factual clarification, stating that

> without Mr. Lynch soliciting any money from Mr. Campanella, Mr. Campanella gave Mr. Lynch an envelope. And when Mr. Lynch brought it home, he determined that it contained approximately $20,000 in cash. The purpose that (sic) Mr. Campanella gave this money to Mr. Lynch was as a reward for the assistance that Mr. Lynch had previously provided to Mr. Campanella and also to maintain and continue his relationship with Mr. Lynch when the need for assistance would arise in the future. Mr. Lynch failed to disclose this payment as he was required to do by law . . . .
>
> The Government would introduce records from the City of Philadelphia on several properties that Mr. Lynch helped Mr. Campanella both before and also after the payment. And after the payment, Mr. Lynch was required by law to disclose, as I said before, which he failed to do, that he had a financial relationship with Mr. Campanella and also recuse himself from any matters involving Mr. Campanella. He also did not do that.

---

[7]    Although counsel respectfully disagrees with Judge Giles's characterization of the government's burden, the important point for present purposes is that "accepting a payment, knowing that it was intended [by the payor] to influence [the person accepting it]," is not § 1346 bribery. A public employee who takes a payment does not commit bribery unless he specifically intends to exchange an official act for the payment. Kemp, 500 F.3d at 281. "Knowing" of another's intent is not the mental state for bribery; the "intent to be influenced" is. Id. Although Judge Giles later went on to reference "specific intent . . . not mistake, but specific intent to do something wrong," Transcript of Change of Plea Hearing, Exhibit C, at 11:3-6, that general statement equating specific intent with the absence of mistake also fell short. At no point in this record did anyone accuse Mr. Lynch of harboring the requisite intent for bribery.

Id. at 23:11-21, 24:16-23 (emphasis added).  The Court inquired of the government:

> Mr. Lynch has expressed that he did not solicit the money, that he found in the envelope money, that he did not return it to Mr. Campanella.  <u>Does the Government articulate how the non-returning of the money, the not reporting of the money constituted agreement with Mr. Campanella to compromise the honest services from Mr. Lynch?</u>

Id. at 26:6-11 (emphasis added).   The government explained, using the framework of Panarella,

> The agreement occurred once Mr. Lynch decided not to return that money and failed to disclose that he had received that money but continued to work with Mr. Campanella . . . .

Id. at 26:12-15.  In other words, when the Court invited the government to identify the means by which Mr. Lynch committed the charged crime, the government identified a Panarella theory, and only a Panarella theory.

The Court then colloquied the defendant about the factual basis.  Mr. Lynch specifically denied any understanding that Mr. Campanella was trying to buy influence[8], but admitted that he should have recused himself from matters subsequent to the payment.  Id. at 6-9.  The Court then posed a critical question; in paraphrase, did Mr. Lynch admit selling his official actions?  The colloquy went as follows:

THE COURT:        Well, the Government charges in this case that you had an understanding of some kind with Mr. [Campanella] that, in effect, he could buy your honest services?

MR. LYNCH:        I understand that, Your Honor, and – and that's what I disagree with.  I didn't sell the job out.

THE COURT:        Well, the Government, as I told you, has the burden of proving specific intent to take the money for the purpose of influencing your actions.

---

[8]      As noted above at footnote 7, even had Mr. Lynch "known" of Mr. Campanella's intent to influence him (if indeed Mr. Campanella had that intent), that knowledge would not establish that Mr. Lynch himself harbored the intent to be influenced that is required for bribery.

MR. LYNCH:          I disagree with that, Your Honor –

THE COURT:          Now – okay.

MR. LYNCH:          -- but the problem is I didn't return the money.

THE COURT:          Well, so are you withdrawing your guilty plea?

                    . . .

                    . . . the question is whether or not you admit to having the specific intent
                    to commit the offense charged.

MR. LYNCH:          I had no intent whatsoever, Your Honor.

Id. at 31:17-32:12.


     As this point the prosecutor jumped in to clarify a determinative point:  the government

was not charging bribery:

MR. SCHWARTZ:    Your Honor, if I – if I may, just to – to clarify honest
                 services law.  We're not suggesting that necessarily the
                 decisions changed because of the money.  What is a fraud
                 under the law is that a public official who has accepted
                 money then acts in an official capacity on matters that
                 benefit the person who paid him without disclosing it. . . .
                 We're not necessarily suggesting that Mr. Lynch would
                 have done something differently, but that he did official
                 actions without disclosing them.  . . . [T]he Government
                 contends, that honest services fraud is committed when he
                 responds to Mr. Campanella's request, issues [City
                 certifications] knowing that he had this undisclosed
                 financial interest.  Just to clarify.  Now, whether or not Mr.
                 Lynch accepts that, obviously, that's the question for today.

Id. at 32:13-33:9 (emphasis added).

     Mr. Lynch replied "Mr. Schwartz is correct."  Id. at 33:10-11.  He then gave a lengthy

explanation of his position, responding to periodic questions from the Court; id. at 33:11-37:1;

which culminated in the Court telling him "if you truly believe that you didn't do anything

criminal, then you shouldn't plead guilty.  You shouldn't expect the Court to accept your guilty

10

plea." Id. at 37:5-7, 9.  Reiterating what the prosecutor had said, Mr. Lynch explained why he

was admitting criminality:

> the criminality was not to return the money.  Mr. Schwartz is right.
> I didn't recuse myself. . . . I talked this over with my attorney.  I
> just – all I want to just – to just make sure, Your Honor, is I didn't
> sell the job out.

Id. at 37:10-24.

The Court then asked counsel why it should accept the plea.  Defense counsel explained

that "the law is that he receives – he didn't know he received the money, he had the money.  He

should have returned it.  He didn't put it on his disclosure form, and, unfortunately, that's honest

services fraud."  Id. at 38:5-8.  The Court asked "where is the mens rea?," and counsel explained

"the mens rea is not returning the money, Your Honor, and dealing with Mr. Campanella.  . . .

When he filled his disclosure form out, he didn't disclose to the City that – that he had the

money, and – and he did – he had dealings with Mr. Campanella."  Id. at 38:11-12 (the Court);

38:13-39:13 (defense counsel).

With that, the Court accepted the plea.  The Court's statement leaves no doubt that Mr.

Lynch was convicted of conspiring to commit honest services fraud by failing to disclose a

conflict of interest:

> The Court accepts the guilty plea.  The defendant has admitted that
> he kept the 20 – kept the $19,400, that he had an obligation not to
> accept it, that he had an obligation to report that it had been
> received by him.  Not only did he fail to disclose it, but he
> continued to act on behalf of Mr. Campanella and act on behalf of
> Mr. Campanella knowing that the Board of Revision of Taxes
> believed that he had not been the recipient of any money from
> anybody interested in any of the transactions.

Id. at 40:6-14.

The Court reiterated this view of the case at sentencing.  In sentencing Mr. Lynch to

probation, among other factors it considered "the character of the violation, which is – which can't be emphasized enough not to be proven to have been a *quid pro quo* situation." Transcript of Sentencing Hearing, attached hereto as Exhibit D, at 44:2-5.

Indisputably, Mr. Lynch's conviction is predicated on an undisclosed conflict of interest alone. Indisputably, he stands convicted on facts that no longer constitute a crime.

## II. MR. LYNCH IS NOT ONLY SUFFERING THE CONTINUING CONSEQUENCES OF AN INVALID CONVICTION, HE IS STILL SERVING HIS SENTENCE.

Even though his supervised release terminated earlier this month, Mr. Lynch continues to suffer the consequences of his invalid conviction. Indeed, as explained below, he is still serving his sentence. Moreover, in addition to the civil disabilities that affect most people convicted of felonies,[9] Mr. Lynch faces additional continuing consequences. If the Court deems the showing that Mr. Lynch makes on these papers to be insufficient, he respectfully requests that the Court afford him an opportunity to establish for the record these and other continuing consequences to him.

### A. Mr. Lynch Was Sentenced To Pay A $25,000 Fine, On Which He Continues To Make Payments.

#### 1. The Court Need Not Reach The Issue of Continuing Consequences, Because Mr. Lynch Is Still Serving His Sentence.

Mr. Lynch was sentenced to three years' probation and a $25,000 fine, on which he has paid approximately $1400. The ongoing payment of the fine is part of Mr. Lynch's sentence, which Mr. Lynch is still serving with payments of $100 per month. See Petition of U.S.

---

[9]     See generally INTERNAL EXILE:  COLLATERAL CONSEQUENCES OF CONVICTION IN FEDERAL LAWS AND REGULATIONS (American Bar Association, January 2009), available at www.abanet.org/cecs/internalexile.pdf.

Probation Office On Supervised Release, Docket Entry # 50 ("The obligation to pay the fine will continue after Mr. Lynch concludes his period of supervision"); ordered by the Court on December 22, 2010. See also September 25, 2009 Order Denying Defendant James Lynch's Request For Remission Or Reduction Of His Fine, Docket Entry # 45.

Thus, the Court need not even wrestle with the concept of "continuing consequences." Continuing consequences are at issue only when "the [petitioner's] term has been served." United States v. Morgan, 346 U.S. 502, 512 (1954); accord Osser, 864 F.2d at 1059 (coram nobis not available "if a sentence has been executed unless the conviction carries continuing penalties") (emphasis added). The premise for requiring collateral consequences is that the defendant has finished serving his sentence. Mr. Lynch has not. The specter of Mr. Lynch writing his $100 check to the federal government, every month for the foreseeable future, is the specter of a defendant continuing to serve his sentence for conduct that is not a crime. Mr. Lynch need not demonstrate collateral consequences flowing from his invalid conviction because the direct consequences continue to accrue.

2.      If The Court Reaches The Question Of Continuing Consequences, The Ongoing Fine Payments Meet The Standard.

Even if the Court rejects that analysis and reaches the question of continuing consequence, the ongoing fine payments satisfy that standard as well. The Third Circuit has not ruled whether the continuing obligation to pay a fine (or the loss of the fine amount already paid) is a continuing consequence that warrants coram nobis relief. In its 1989 Osser decision, the circuit court noted the Seventh Circuit's position that past payment of a fine is insufficient, but also noted the Ninth Circuit's contrary position that a criminal conviction presumptively carries continuing consequences. Osser, 864 F.2d at 1059-60 (citations omitted). The Osser court did not rule on the issue. Id. at 1060. Later, in its 2003 Obado decision, the circuit court ruled that a

continuing obligation to pay restitution is not "custody" for purposes of § 2255, and then noted that the petitioner in that case could yet seek coram nobis relief.  Obado v. New Jersey, 328 F.3d 716, 718 (3d Cir. 2003) (per curiam).  The suggestion in Obado is clearly dictum, and Mr. Lynch does not contend otherwise – but this Court may take note that the distinguished panel in Obado (Becker, Aldisert, and Weis), having ruled that ongoing restitution payments were insufficient to support a § 2255 motion, saw no inconsistency between that ruling and the possibility of coram nobis relief.

The analytic framework for "continuing consequences" is the Article III "case or controversy" requirement; the continuing consequence need only be sufficient to create a justiciable controversy.  United States v. Cariola, 323 F.2d 180, 184 (3d Cir. 1963) (loss of right to vote suffices); accord United States v. Dellinger, 657 F.2d 140, 144 n.6 (7th Cir.1981); United States v. National Plastikware Fashions, Inc., 368 F.2d 845, 846 (2d Cir. 1966) (per curiam).  In its landmark case recognizing the availability of coram nobis relief, the Supreme Court described the requirement in a way that leans toward the Ninth Circuit's presumption of continuing consequences, even when speculative:

> Although the term has been served, the results of the conviction may persist.  Subsequent convictions may carry heavier penalties, civil rights may be affected.  As the power to remedy as invalid sentence exists, we think [petitioner] is entitled to an opportunity to attempt to show that this conviction was invalid.

Morgan, 346 U.S. at 512-13 (emphasis added).[10]

Against the backdrop of the permissive language in Morgan, the concrete continuing

---

[10]    In cases citing Morgan and its progeny, the Fourth and Fifth circuits have also taken a permissive, and arguably even presumptive, approach to continuing consequences.  E.g., United States v. Mandel, 862 F.2d 1067 (4th Cir. 1988); United States v. Marcello, 876 F.2d 1147 (5th Cir. 1989) (see discussion and cases collected in United States v. Loftus, 796 F. Supp. 815 (M.D. Pa. 1992)).

harm of paying a fine is indisputably a "continuing consequence." The Court need not even embrace a permissive standard to so rule. A fine is punishment for criminal conduct, pure and simple. The Seventh Circuit's suggestion that a fine is equivalent to a civil judgment, United States v. Keane, 852 F.2d 199, 203 (7th Cir. 1988), appears to conflate fines with restitution. A fine is certainly a consequence "unique to criminal convictions." Osser, 864 F.2d at 1059-60 (citing Keane). Although the civil process may impose upon a defendant a liability to the victim (i.e., restitution), only the criminal process may impose a fine.

Moreover, Keane (and Osser, in citing Keane) addressed only a defendant who has already paid his fine. When a fine has long since been paid, perhaps it is only "a sunk cost rather than a continuing disability producing additional injury as time passes." Keane, 852 F.2d at 204. But Mr. Lynch's fine has not been paid. Mr. Lynch has paid approximately $1400 toward his fine, still owes $23,600, and continues to make monthly $100 payments toward that obligation. When the Court terminated his supervised release, it did so subject to the continuing obligation. See Petition of U.S. Probation Office On Supervised Release, Docket Entry # 50; ordered by the Court on December 22, 2010. At a minimum the ongoing payments surely create an Article III controversy and satisfy the "continuing consequences" requirement for coram nobis.

**B.    Mr. Lynch Has Lost The Pension That He Accumulated During His Years of City Service.**

The Third Circuit has not decided whether the loss of a City pension is a continuing consequence for coram nobis purposes. Osser, 864 F.2d at 1060 n.3. This Court should hold that it is.

The Board of Pensions ("Board") disqualified Mr. Lynch's pension because his criminal

15

conviction related to his City employment.[11]  See Public Employee Pension Forfeiture Act, 43 Pa. Stat. § 1311, et seq.; and Philadelphia Code § 22-1302.  The Board also voted to retain Mr. Lynch's pension contributions (i.e., the money that Mr. Lynch himself contributed out of his payroll, as opposed to money accrued as a benefit) toward the payment of the fine.  The Philadelphia Court of Common Pleas affirmed that decision.  See September 18, 2009 Letter Notification from Board to Mr. James Lynch, and June 16, 2010 Order of Court of Common Pleas, both attached hereto as Exhibit "E."

The loss of his accumulated pension, and the use of the contributed funds toward payment of the fine, are continuing consequences of Mr. Lynch's invalid conviction for coram nobis purposes.

### C.    Mr. Lynch Is Ineligible For Future Public Employment.

Despite his lifetime of civil service, Mr. Lynch is ineligible for future public employment with the City of Philadelphia or elsewhere.  Although a prior conviction is not a *per se* bar to City employment, a conviction related to his prior City employment certainly is.  Mr. Lynch's ineligibility for public employment is another continuing consequence of his invalid conviction, warranting coram nobis relief.  United States v. Loftus, 796 F. Supp. 815, 827 (M.D. Pa. 1992) ("markedly diminished" chance of obtaining a professional license suffices for coram nobis, even applying strict Seventh Circuit standard).

Accordingly, the Court should either rule that Mr. Lynch need not show continuing

---

[11]    Defense counsel has requested from the lawyer who handled Mr. Lynch's pension matter a copy of any written opinion of the Board, but has not yet received it (or received confirmation that one exists) as of the date of this filing.  Counsel will file as a supplemental exhibit any opinion of the Board that she receives.

consequences from his conviction; or rule that he has done so.

### III.   NO REMEDY WAS AVAILABLE TO MR. LYNCH AT TRIAL, AND HE HAD SOUND REASONS FOR NOT SEEKING RELIEF EARLIER.

Skilling was decided on June 24, 2010, and within six months Mr. Lynch filed his Motion to Vacate. His "sound reason" for not seeking relief earlier is that he had no basis for relief earlier. The facts that he admitted at his plea colloquy were a crime at the time that he pled guilty. After Skilling, they are not.

The Third Circuit had already rejected, prior to Mr. Lynch's plea, the only issue that Mr. Lynch could conceivably have raised on direct appeal: whether failing to disclose a conflict of interest, while taking discretionary action to benefit that interest, constitutes honest services fraud. Panarella, 277 F.3d at 694. No other challenge to Mr. Lynch's conviction was reasonably available to him at trial or after, until Skilling.

Moreover, Mr. Lynch's plea agreement contained an appeal waiver, with a single exception for constitutional issues. Skilling clarified that what we now call "Skilling error" – the issue that this Motion raises – is constitutional error, Skilling, 130 S. Ct. at 2932-33; but prior to Skilling the constitutional (as opposed to, for example, instructional) nature of the error was not clear.[12] Not only would an appeal have failed on the merits, it likely would have been dismissed

---

[12]   In fact, the petitioners in the Skilling companion cases Black and Weyhrauch actually pursued their claims as instructional error, noting the constitutional issue only to suggest that the Supreme Court should avoid it with a narrow statutory construction. See Merits Brief for Petitioner Conrad M. Black, No. 08-876, at p. "i" (Questions Presented) and at 16-22 (Summary of Argument), available at http://www.abanet.org/publiced/preview/briefs/pdfs/07-08/08-876_Petitioner.pdf; and Merits Brief for Bruce Weyhrauch, No. 08-1196, at page "i" (Question Presented) and 18-22 (Summary of Argument), available at http://www.abanet.org/publiced/preview/briefs/pdfs/07-08/08-1196_Petitioner.pdf.

out of hand. The same may be said of a pre-<u>Skilling</u> collateral attack.[13] These are sound reasons for failing to seek relief earlier.

"Sound reasons for failing to seek relief earlier," under coram nobis, is a more flexible standard than "cause and prejudice" excusing procedural default under § 2255. <u>United States v. Darnell</u>, 716 F.2d 479, 481 & n.5 (7th Cir. 1983) (declining to import stricter cause and prejudice standard into coram nobis context, because "fundamental error" and other standards adequately safeguard against meritless litigation). If the Court holds that the two are equivalent, however, then Mr. Lynch respectfully requests an opportunity to demonstrate "cause and prejudice," including the ineffective assistance of counsel for advising Mr. Lynch to plead guilty, and for failing to pursue the <u>Skilling</u> issues earlier. Likewise, if the Court holds that the state of the law pre-<u>Skilling</u> does not supply a "sound reason" (whether or not distinct from "cause and prejudice") for Mr. Lynch's failure to pursue relief earlier, then Mr. Lynch respectfully requests the opportunity to further develop the record on that topic as well.

---

[13] Mr. Lynch's plea agreement also waived collateral attack except for constitutional errors, which means that Skilling's characterization of the error as constitutional was also essential to Mr. Lynch's ability to seek collateral review. A collateral attack prior to <u>Skilling</u> would have had no more likelihood of succeeding on the merits than would a direct appeal, in any event.

18

## CONCLUSION

For all of these reasons, and those stated in Mr. Lynch's *pro se* Motion to Vacate, the

Court should grant the Motion and vacate the judgment of conviction and sentence.

Respectfully submitted,

/s/_____
Lisa A. Mathewson, Esquire
The Law Offices of Lisa A. Mathewson, LLC
123 S. Broad Street, Suite 810
Philadelphia, PA 19109
(215) 399-9592
(215) 600-2734 (facsimile)
lam@mathewson-law.com

Counsel for James F. Lynch

January 31, 2011

19

## <u>CERTIFICATE OF SERVICE</u>

I, Lisa A. Mathewson, do hereby certify that on this date I caused a true and correct copy

of the foregoing to be served upon the following by electronic filing and electronic mail:


AUSA Robert Zauzmer
AUSA Richard Barrett
United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476



/s/
Lisa A. Mathewson


Date:    January 31, 2011