

**U.S. Department of Justice**

*United States Attorney*

*Eastern District of Pennsylvania*

| | |
|---|---|
| *Robert A. Zauzmer* | *615 Chestnut Street* |
| *Direct Dial: (215) 861-8568* | |
| *Facsimile: (215) 861-8618* | *Suite 1250* |
| *E-mail Address: bob.zauzmer@usdoj.gov* | *Philadelphia, Pennsylvania 19106-4476* |
| | *(215) 861-8200* |

September 2, 2010

The Honorable Jan E. DuBois
United States District Judge
12613 United States Courthouse
601 Market Street
Philadelphia, PA  19106-1766

      Re:  United States v. James F. Lynch
           Criminal No. 07-00431-01

Dear Judge DuBois:

     I enclose for the Court's convenience a courtesy copy of the Government's Response to Defendant's Motion for Writ of Error Coram Nobis in the above case.  A copy of the response has been served upon counsel for the defendant, and the original of the pleading has been filed electronically with the Clerk of Court.

                    Respectfully yours,

                    ZANE DAVID MEMEGER
                    United States Attorney

                    /s Robert A. Zauzmer
                    ROBERT A. ZAUZMER
                    Assistant United States Attorney

cc:  Lisa A. Mathewson, Esq.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA  :

      v.  :  CRIMINAL NO. 07-00431-01

JAMES F. LYNCH  :


<u>O R D E R</u>

AND NOW, this      day of      , 2011, upon consideration of the motion of James F. Lynch for a writ of error coram nobis, vacating his 2007 conviction for conspiracy to commit honest services mail fraud, and the government's response to that motion, it is hereby

ORDERED

that Lynch's motion is denied.

BY THE COURT:


_____
The Honorable Jan E. DuBois
United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :

        v.               :     CRIMINAL NO. 07-00431-01

JAMES F. LYNCH           :

### GOVERNMENT'S RESPONSE TO DEFENDANT'S
### MOTION FOR WRIT OF ERROR CORAM NOBIS

James F. Lynch, who was convicted of and served a probationary sentence for conspiracy to commit honest services mail fraud, seeks a writ of error coram nobis vacating that conviction. He acts on the basis of the Supreme Court's decision in Skilling v. United States, 130 S. Ct. 2896 (2010), which limited the range of conduct prohibited by the honest services statute.

Lynch is not entitled to relief, given the fact that the post-conviction remedy of coram nobis which he seeks is extraordinary, and he does not meet all of the rigid applicable requirements. Notably, at this very late stage, it is Lynch's burden to establish that he is not guilty of the charged crime not just under the invalid

theory of honest services fraud which he previously admitted, but under any valid theory of honest services fraud, as <u>Skilling</u> defined it. He cannot meet this burden, as the facts stated in the information support a claim of bribery and kickback, which the Supreme Court determined may be prosecuted under the honest services statute.

I. <u>Background</u>.

A. <u>Procedural History</u>.

On July 30, 2007, the United States Attorney filed an information charging defendant James F. Lynch with one count of conspiracy to commit honest services mail fraud (18 U.S.C. §§ 1341, 1346), in violation of 18 U.S.C. § 371. On September 14, 2007, Lynch pled guilty to the charge. On January 17, 2008, the Court imposed a sentence of three years' probation, a fine of $25,000, and a special assessment of $100.

On December 20, 2010, the probation officer advised the Court that Lynch had paid the special assessment, as well as $1,300 of the imposed $25,000 fine, and would continue to make $100 monthly payments after the

termination of supervision.  On December 22, 2010, the Court

approved the probation officer's recommendation that

supervision expire with the outstanding fine balance

remaining.

In the meantime, in <u>Skilling</u>, the Supreme Court in

June 2010 addressed the honest services issue.  The Supreme

Court held that the "conflict-of-interest" theory of honest

services fraud, earlier accepted in the Third Circuit and

elsewhere, where an official violates a duty of disclosure

and takes official action benefitting that undisclosed

interest, is not supported by the honest services statute.

The <u>Skilling</u> Court, however, determined that the honest

services statute does proscribe bribery and kickback

schemes.  <u>Skilling v. United States</u>, 130 S. Ct. 2896 (2010).

On December 20, 2010, Lynch filed a pro se motion

under 28 U.S.C. § 2255, seeking to invalidate his conviction

on the basis of <u>Skilling</u>.  At the guilty plea hearing in

September 2007, Lynch had insisted that he was guilty only

of the conflict-of-interest violation, and accordingly he

now contends that his conviction cannot stand.  This Court

promptly appointed counsel for Lynch, and granted permission

- 3 -

for defense counsel to file a supplemental memorandum in support of Lynch's 2255 petition.  Defense counsel filed the supplemental memorandum on January 31, 2011, to which the government now responds.[1]

B.   Factual Background.

The government explained the facts of the case in its guilty plea memorandum.  See Exh. B at 2-7.  In short, Lynch was a tax assessor for the Philadelphia Board of Revision of Taxes (BRT), responsible for the tax assessment of industrial and other types of properties in the City of Philadelphia.  Lynch worked for the City of Philadelphia beginning in approximately 1980.  Co-defendant James F. Campenella was the owner of Campenella Construction, Inc., a company that performed construction work and developed commercial real estate in Philadelphia, and was also a partner in various real estate projects.

As part of his real estate development businesses, Campenella often interacted with the BRT, receiving notices

---

[1]  References in this pleading to "Br." are to the supplemental memorandum filed by defense counsel. References to "Exh." are to the exhibits counsel helpfully compiled of the pertinent materials in this case, and attached to the supplemental memorandum.

of increased tax assessments as a result of the increased value of properties that Campenella developed, negotiating with tax assessors in an attempt to lower the tax assessments, appealing assessments to the BRT, defending lawsuits brought by the City of Philadelphia relating to real estate taxes, and otherwise resolving tax issues that arise as a result of the purchase and sale of property for development.  To assist in these dealings with the BRT, Campenella often retained lawyers to appear on his behalf and to appeal tax assessments to the BRT and to negotiate with the Philadelphia Law Department.

In an effort to reduce the costs of retaining outside lawyers, Campenella sought the assistance of Lynch to, among other things, resolve tax issues that arose out of the purchase and sale of property for development and negotiate the amount of increased tax assessments.  In a number of cases, Lynch was able to resolve and negotiate these issues, saving Campenella significant legal fees as well as tax payments.

In or about November 2005, the government asserted, "Campenella gave Lynch approximately $20,000 in

cash as a reward for the assistance provided by Lynch and to maintain his relationship with Lynch when the need for assistance arose in the future.  Lynch failed to disclose this payment as he was required by law to do."  Exh. B at 4.

Specifically, on November 4, 2005, Campenella signed two checks for $5,000 each made payable to petty cash from the accounts of Bailey Chestnut Partners, L.P., one of his partnerships, at Hudson United Bank, and caused the checks to be cashed.  On or about November 11, 2005, Campenella signed another two checks for $5,000 each made payable to petty cash from the accounts of Bailey Chestnut Partners, L.P. at Hudson United Bank and caused the checks to be cashed.  Campenella then caused the $20,000 in petty cash checks to be recorded on the accounting records of Bailey Chestnut Partners, L.P. as real estate tax expenses. Campenella gave the cash to Lynch.

When FBI agents first approached Lynch in May 2007, he denied having any financial relationship with Campenella.  However, on May 10,2007, Lynch voluntarily surrendered $19,400 in cash, stating that it represented the money that Campenella had given to him in November 2005.

The evidence further showed the reason for Campenella's largesse.  In the November 2005 time period, Campenella talked with his employees about how the taxes on his properties in Philadelphia were a "huge expense" and how he needed to "do something about it."  After Campenella met or spoke with Lynch, Campenella would speak about how his "taxes got lowered" or that his "problems were resolved."

Records from the City of Philadelphia showed that there were at least four properties for which Lynch assisted Campenella on tax issues immediately before and after receiving the $20,000 in cash:

-- The City of Philadelphia sought delinquent real estate taxes in the amount of $73,544.87 for property developed by Campenella at 2500 Mifflin Street.  On October 13, 2005 (shortly before receiving cash from Campenella), Lynch contacted the City of Philadelphia Law Department and stated that the tax assessment for the property at 2500 Mifflin Street was not accurate and that the delinquent tax assessment should be deleted.  A year later, in September 2006, with the issue still unresolved, Lynch again contacted the Law Department and stated that he

had issued certifications to have the tax delinquency removed for the property at 2500 Mifflin Street.

-- Before the cash payment, Lynch assisted Campenella in seeking to lower the assessed value of a property Campenella acquired at 1101-13 Locust Street (the Western Union Building). On June 27, 2005, Lynch submitted a request to the BRT to lower the assessed value of the property at 1101-13 Locust Street from $4,600,000 to $1,600,000.

-- On August 10, 2005, Campenella received notification from BRT that the assessed value of the property at 323-27 N. 13th Street, a property that Campenella had recently acquired, was to be raised to $3,000,000. Campenella then asked if Lynch could help lower the assessed value of the property at 323-27 N. 13th Street. On October 24, 2005, Lynch submitted a request to the BRT to lower the assessed value of the property to $1,600,000. On November 17, 2005, at the same time that he made the $20,000 cash payment to Lynch, Campenella received by U.S. mail a notice that BRT lowered the assessed value for the property as Lynch requested.

-- In February 2006, Campenella received notification that the City of Philadelphia Law Department filed a lawsuit in the Court of Common Pleas of Philadelphia County against one of his entities, Oyr Realty Partners, L.P., relating to the tax assessments for the property at 5201 Old York Road.  On April 21, 2006, Campenella received a copy of the City's pretrial memorandum and understood that his attorneys would prepare a response that was due to be filed with the court by May 22, 2006.  On April 21, 2006, Campenella sent an e-mail to his attorneys stating, "Hold tight.  I believe we will be resolved shortly.  Please don't speak to assessors."  Campenella then asked Lynch to help him resolve the dispute.  On April 24, 2006, Campenella sent an e-mail to his attorneys stating, "The matter is resolved."  Lynch assisted Campenella in settling the matter with the City.

II. **Argument**.

    A.    Lynch's Petition Must Be Considered as a Motion
           for a Writ of Error Coram Nobis.

    As Lynch grudgingly acknowledges, <u>see</u> Br. 1-2, his probationary term expired shortly after he filed his motion

captioned under 28 U.S.C. § 2255, and therefore he may no longer maintain a 2255 petition.  Such a petition is permitted only when the defendant is "in custody."  While Lynch may still be compelled to pay the balance he owes of his $25,000 fine, that monetary penalty is not "custody," as courts have unanimously held.  See, e.g., United States v. Michaud, 901 F.2d 5, 7 (1st Cir. 1990) (per curiam) ("A monetary fine is not a sufficient restraint on liberty to meet the 'in custody' requirement for § 2255 purposes," and therefore the fact that a defendant's $60,000 fine remained outstanding after he had been released from incarceration did not satisfy the requirement); United States v. Watroba, 56 F.3d 28, 29 (6th Cir. 1995); Williamson v.  Gregoire, 151 F.3d 1180, 1183 (9th Cir. 1998) (citing numerous cases).

In Obado v. New Jersey, 328 F.3d 716 (3d Cir. 2003), the Court expressly relied on this authority in holding that an order of restitution is also not "custody."  The Court stated:  "The payment of restitution or a fine, absent more, is not the sort of 'significant restraint on liberty' contemplated in the 'custody' requirement of the federal habeas corpus statutes."  Id. at 718.  See also

<u>Barry v. Bergen County Probation Dept.</u>, 128 F.3d 152, 161

(3d Cir. 1997) (in holding that compelled community service

is a form of "custody," distinguishing "fine-only" cases

"because such sentences implicate only property, not

liberty").

The <u>Obado</u> Court held that a defendant subject

solely to a monetary penalty may gain collateral relief, if

at all, only through coram nobis.  328 F.3d at 718.  We

therefore turn to that subject.

B.    <u>The Nature of Coram Nobis Relief</u>.

After a criminal judgment has been executed, a

defendant may seek coram nobis relief to void the

conviction, but only in exceptional circumstances.  The

availability of a writ of error coram nobis is extremely

limited, due to necessary judicial disfavor for voiding the

finality of criminal judgments.  The power to grant such a

writ is conferred by the All Writs Act, 28 U.S.C. § 1651(a).

However, "[t]o confine the use of coram nobis so that

finality is not at risk in a great number of cases," the

availability of the writ is limited to "'extraordinary'

cases presenting circumstances compelling its use 'to

achieve justice.'"  United States v. Denedo, 129 S. Ct.

2213, 2220-21 (2009) (quoting United States v. Morgan, 346

U.S. 502, 511 (1954)).  "[C]ourts must be cautious so that

the extraordinary remedy of coram nobis issues only in

extreme cases."  Denedo, 129 S. Ct. at 2223.

Accordingly, "'[t]he interest in finality of

judgments dictates that the standard for a successful

collateral attack on a conviction be more stringent than the

standard applicable on a direct appeal.' . . . It is even

more stringent than that on a petitioner seeking habeas

corpus relief under § 2255."  United States v. Stoneman, 870

F.2d 102, 106 (3d Cir. 1989) (quoting United States v.

Gross, 614 F.2d 365, 368 (3d Cir. 1980)).  "Any proceeding

which is challenged by the writ is presumed to be correct

and the burden rests on its assailant to show otherwise

. . . . Relief will be granted only when circumstances

compel such action 'to achieve justice.'"  United States v.

Cariola, 323 F.2d 180, 184 (3d Cir. 1963) (quoting Morgan).

Therefore, coram nobis relief is reserved only for

extreme cases involving fundamental error.  Where a person

is convicted for conduct which is not a crime, that error is

fundamental, and may warrant coram nobis relief.  Stoneman,

870 F.2d at 105.  But relief is not assured.  While a person

has a fundamental right not to be convicted of conduct not

covered by a criminal statute, "other factors must be taken

into account.  The interest in finality of judgments is a

weighty one that may not be casually disregarded.  Where

sentences have been served, the finality concept is of an

overriding nature, more so than in other forms of collateral

review such as habeas corpus, where a continuance of

confinement could be manifestly unjust."  United States v.

Osser, 864 F.2d 1056, 1059 (3d Cir. 1988).[2]  As will be

seen, no relief is warranted in this case.

C.   Lynch May Maintain a Petition for a Writ of Error
     Coram Nobis.

     The government does not dispute, as a procedural

matter, that Lynch has set forth sufficient continuing

_____

     [2]  The Supreme Court has often referred in the context
of collateral challenges to the indispensable requirement of
finality in criminal cases, describing it as "essential to
the operation of our criminal justice system.  Without
finality, the criminal law is deprived of much of its
deterrent effect."  Teague v. Lane, 489 U.S. 288, 309
(1989).

consequences of his conviction which permit him to pursue a writ of coram nobis.

In keeping with the extraordinary nature of the writ, it has long been held in this Circuit that coram nobis is only available where there are continuing legal consequences of the conviction.[3] <u>United States v. Osser</u>, 864 F.2d 1056, 1059-60 (3d Cir. 1988). Significantly, the impact of a past conviction on a defendant's reputation or status is not sufficient. "[T]he petitioner's embarrassment and loss of prestige . . . is not enough to justify a judicial determination of petitioner's rights. The moral stigma of a judgment which affects no legal rights presents no case or controversy of federal cognizance." <u>United States v. Cariola</u>, 323 F.2d 180, 182 (3d Cir. 1963). <u>Accord Fleming v. United States</u>, 146 F.3d 88, 90 (2d Cir. 1998).

In this case, as Lynch states, he has paid but a fraction of the $25,000 fine which was imposed, and the government may continue to endeavor to collect the fine. That collateral consequence warrants a petition for the writ

_____

[3] This is roughly akin to the requirement of 2255 relief that a defendant remain "in custody" in order to seek a remedy.

of coram nobis.  See, e.g., United States v. Michaud, 925

F.3d 37, 39 n.1 (1st Cir. 1991).  This situation may be

distinguished from an effort to recover a fine which has

already been paid, for which coram nobis relief is not

allowed.

We note that the other consequences asserted by

Lynch -- loss of his pension, and likely inability to secure

public employment, Br. 15-16 -- would be insufficient

standing alone.

In Osser, the Court endorsed the views stated in

United States v. Keane, 852 F.2d 199 (7th Cir. 1988), which

held:

> [T]he writ is valuable to bring an end to what may be
> substantial civil disabilities attached to criminal
> convictions.  These include loss of the rights to vote,
> hold occupational licenses (including law licenses),
> and bear arms; criminal convictions also may lead to
> enhanced penalties for future offenses. . . . Criminal
> convictions sometimes produce financial penalties and
> diminish the reputation of the defendant, but these do
> not entail continuing legal effects of a judgment.

Id. at 203.

The Seventh Circuit separately expounded that

while exclusion from an occupation may justify relief, a

defendant does not suffer a sufficient infringement just

- 15 -

because, as a result of his past conviction, he is not

favored for "plum positions" within his chosen occupation.

> Unwillingness to hire someone for mouth-watering jobs is not a legal disability "unique to criminal convictions." Keane, 852 F.2d at 203. It is not a "legal disability", period. Lower-status jobs follow pratfalls of all kinds. Take away the conviction, and Bush still suffered a severe lapse of judgment that led Mayor Daley to show him the door. It is hard to recover from such humiliations. To endure a restricted occupational menu is not to suffer a civil disability.

United States v. Bush, 888 F.2d 1145, 1150 (7th Cir. 1989).

The Seventh Circuit summarized:

> In Bush, we held that a coram nobis petitioner's desire to obtain a desirable job did not constitute a civil disability. 888 F.2d at 1149. In Keane, we held that the possibility of recovering a fine was also not enough to justify coram nobis relief. 852 F.2d at 204. The petitioners in both Keane and Bush still suffered the adverse effects of their erroneous convictions, but we recognized that our legal system must tolerate the chance of error in order to function. See Keane, 852 F.2d at 206. The continual reexamination of old convictions "subtracts from the time available to deal with festering grievances" of today. Bush, 888 F.2d at 1150. Considering these systemic interests in finality, we have rejected coram nobis petitions except where there is a concrete threat that an erroneous conviction's lingering disabilities will cause serious harm to the petitioner. Thus, the types of disabilities sufficient to justify coram nobis relief can be broken down into three elements. First, the disability must be causing a present harm; it is not enough to raise purely speculative harms or harms that occurred completely in the past. Second, the disability must arise out of the erroneous conviction.

- 16 -

Third, the potential harm to the petitioner must be more than incidental.

United States v. Craig, 907 F.2d 653, 658 (7th Cir. 1990).[4]

Here, coram nobis relief is possible only because Lynch remains subject to collection efforts regarding the fine.

Turning to other procedural prerequisites, the government agrees with the defense that the Skilling decision, in limiting the scope of conduct punished as

---

[4] Other courts have parted ways and not accepted the limits placed by the Third and Seventh Circuits, and others. The Ninth Circuit, for example, takes a minority view, holding that there is a presumption that any criminal conviction has collateral consequences at any time thereafter. United States v. Hirabayashi, 828 F.2d 591, 606 (9th Cir. 1997). Likewise, while not directly addressing the requirement that a coram nobis petitioner present ongoing disabilities, the Fourth Circuit suggested that any conviction imposes injury to reputation and a resulting loss of job opportunities. United States v. Mandel, 862 F.2d 1067, 1075 & n.12 (4th Cir. 1988).

Most courts which have addressed the issue are aligned with the Third Circuit. See, e.g., Fleming v. United States, 146 F.3d 88, 91 n.3 (2d Cir. 1998) (criticizing the "open-ended approach" as "inconsistent with the Supreme Court's admonition in Morgan that coram nobis relief is to be treated as an 'extraordinary remedy,'" and endorsing the Third Circuit's statement in Osser that "[w]here sentences have been served, the finality concept is of an overriding nature, more so than in other forms of collateral review such as habeas corpus, where a continuance of confinement could be manifestly unjust.").

criminal, applies retroactively to cases on collateral review. Further, while Lynch in his plea agreement waived the right to appeal or seek collateral relief, the government does not assert that waiver here. An appellate waiver should not be enforced if doing so would result in a "miscarriage of justice." United States v. Mabry, 536 F.3d 231, 242-43 (3d Cir. 2008). A "miscarriage of justice" would occur if the defendant were convicted and punished "for an act that the law does not make criminal." Davis v. United States, 417 U.S. 333, 346 (1974).

Accordingly, it is appropriate to address Lynch's case on the merits, and there it falls short.

D.    Lynch Cannot Establish His Innocence Under the Valid Theory of Honest Services Fraud.

As noted, a person who has been convicted based on conduct which is not a crime has suffered a fundamental error, and is generally entitled to collateral relief. But the present case does not fall within that clear line, in that Skilling did not entirely erase the offense of honest services fraud. Rather, the Supreme Court narrowed the interpretation of the pertinent statute, making clear that

the crime is committed through some conduct but not other acts.

In this case, consistent with then-existing authority, the government charged alternate theories of honest services fraud:  (1) bribery, and (2) failure to disclose a conflict of interest while taking discretionary actions favoring the payor.  See United States v. Antico, 275 F.3d 245, 262 (3d Cir. 2001).

Without a doubt, the undisclosed conflict-of-interest theory of honest services fraud which the parties agreed Lynch committed is not valid in light of Skilling.  However, Skilling did not entirely invalidate honest services fraud.  Sections 1341 of Title 18 prohibits mail fraud, prohibiting a scheme to defraud another of money or property.  Section 1346 provides that such property includes the intangible right to honest services.  Skilling held that while these provisions do not address conflict-of-interest fraud, they do bar the breach of duty which occurs when a public official (or other person owing a fiduciary duty) accepts a bribe or kickback in exchange for official action.

- 19 -

In these circumstances, where the Supreme Court has narrowed but not erased a statutory basis for criminal liability, principles of collateral relief require that the defendant establish that he is "actually innocent" of the offense, that is, that he is innocent not only under the invalid theory but under the remaining theory as well. As will be discussed, Lynch cannot meet that burden. Indeed, in his briefing, he does not even address it. Lynch's position appears to be that, in entering his guilty plea, he only admitted conflict-of-interest fraud, and because that theory has been invalidated that ends the matter. But under abundant precedent which he overlooks, regarding collateral relief in general and coram nobis in particular, it does not.

The decision in <u>Bousley v. United States</u>, 523 U.S. 614 (1998), is informative. <u>Bousley</u> involved the same situation, in which the Supreme Court had earlier issued a new substantive interpretation of a criminal statute, and a prisoner sought a writ of habeas corpus on the grounds that, under the new interpretation, he was innocent of the crime for which he had been convicted. The defendant, like Lynch,

attempted to collaterally challenge his guilty plea.[5] The Supreme Court held that the defendant defaulted on this claim by not presenting it on direct appeal, but could overcome that default by establishing "actual innocence," that is, "that, 'in light of all the evidence,' 'it is more likely than not that no reasonable juror would have convicted him.'" Id. at 623 (quoting Schlup v. Delo, 513 U.S. 298, 327-28 (1995)). The Bousley Court further explained that the defendant must show factual innocence in light of the new statutory interpretation, and that in opposing the claim the government "should be permitted to present any admissible evidence of petitioner's guilt even if that evidence was not presented during petitioner's plea colloquy and would not normally have been offered before our decision in Bailey." Bousley, 523 U.S. at 624.

Lynch's situation is identical to that addressed in Bousley. Further, the "actual innocence" concept is not

---

[5]  Bousley involved a conviction for use of a firearm in furtherance of a violent felony or drug trafficking offense, in violation of 18 U.S.C. § 924(c). In Bailey v. United States, 516 U.S. 137 (1995), the Court had narrowed the definition of "use" as presented in the statute, and then the petitioner in Bousley, like many others, asserted that he had been improperly convicted of the crime.

limited to the 2255 scenario addressed in <u>Bousley</u>.  For example, in <u>In re Dorsainvil</u>, 119 F.3d 245 (3d Cir. 1997), the Court applied the concept in an analogous situation of collateral review.  <u>Dorsainvil</u> addressed the scenario where a defendant has presented his allotted collateral challenge under 28 U.S.C. § 2255, but the Supreme Court then issued a decision which redefined a criminal offense in a manner which the defendant claimed rendered him innocent of that crime.  The Third Circuit held that "a petitioner in Dorsainvil's uncommon situation may resort to the writ of habeas corpus codified under 28 U.S.C. § 2241."  <u>Dorsainvil</u>, 119 F.3d at 248.  The Court reasoned that denying a remedy to a petitioner in Dorsainvil's situation, where he might be actually innocent of an offense, would be a miscarriage of justice.  Many other courts have also recognized that the "actual innocence" test is applicable to a prisoner who has otherwise exhausted his available appellate and 2255 remedies.  <u>See</u> <u>Stephens v. Herrera</u>, 464 F.3d 895, 898 (9th Cir. 2006) (citing cases).

Likewise, in <u>Calderon v. Thompson</u>, 523 U.S. 538 (1998), the Supreme Court applied the "actual innocence"

requirement to a petition to recall an appellate mandate which addressed a habeas petition.  The Court determined that ordinary principles of habeas litigation must apply, most notably the "central concern that the merits of concluded criminal proceedings not be revisited in the absence of a strong showing of actual innocence."  <u>Id.</u> at 558.  The Court reaffirmed that where proceedings are otherwise concluded, a prisoner may obtain relief only upon showing a "miscarriage of justice," defined as "actual as compared to legal innocence."  <u>Id.</u>  The Court explained: "In light of 'the profound societal costs that attend the exercise of habeas jurisdiction,' <u>Smith v. Murray</u>, 477 U.S. 527, 539 [] (1986), we have found it necessary to impose significant limits on the discretion of federal courts to grant habeas relief."  <u>Thompson</u>, 523 U.S. at 554-55.

On this point, Lynch presents only a footnote, claiming that the <u>Bousley</u> rule is not applicable if he may no longer present a 2255 petition.  Br. 4 n.3.  But as the Third Circuit has explained, a person seeking coram nobis relief cannot be permitted to fare better than an incarcerated prisoner pursuing more common habeas remedies.

<u>United States v. Osser</u>, 864 F.2d 1056, 1060 (3d Cir. 1988).

It is imperative to apply to Lynch the same requirement that applies to other habeas petitioners who have exhausted their remedies:  the rule that the defendant must establish his actual innocence under the correctly interpreted statute in order to gain extraordinary relief.

As noted, Lynch makes no effort to do this. Rather, he insists, incorrectly, that he was not charged with the bribery theory, and further argues that he never admitted bribery during the course of the plea proceedings. These points do not address the requirement that he show actual innocence under the statute as presently defined in order to gain extraordinary relief.

While the government maintains that an honest services conviction may be maintained even if the pre-<u>Skilling</u> charging document did not address the bribery/kickback theory sustained by the Supreme Court, given the rules discussed above, the fact is that the information in this case plainly alleged the bribery/kickback theory as well as the now-invalidated conflict-of-interest theory.  Lynch parses the criminal

information in a strained effort to assert that it did not charge bribery.  Br. 5-7.  But the information unambiguously asserted:  "In violation of each aspect of his duties listed above, defendant JAMES F. LYNCH's actions while acting as a tax assessor for the Philadelphia Board of Revision of Taxes were unlawfully rewarded and influenced by bribes, rewards, gifts, loans, and other benefits he received from defendant JAMES F. CAMPENELLA, all of which defendant LYNCH failed to disclose."  Exh. A at 2.  "In or about November 2005, defendant CAMPENELLA gave defendant LYNCH $20,000 in cash as a reward for the assistance provided by defendant LYNCH and to maintain his relationship with defendant LYNCH when the need for assistance arose in the future."  Id. at 3.

These averments -- as well as the facts alleged in the information depicting the manner in which Campenella gave cash to Lynch, and then Lynch continued to take official actions favoring Campenella's interests -- were clearly sufficient to state the bribery theory under the liberal federal pleading rules.  In United States v. Kemp, 500 F.3d 257 (3d Cir. 2007), the Court rejected a similar defense contention, even though the honest services

- 25 -

indictment in that case did not even use the word "bribe," unlike here.

In <u>Kemp</u>, the indictment alleged that businessmen gave benefits to public official Kemp "with the intent to influence KEMP's official actions," and "provided benefits to KEMP in the form of otherwise unavailable loans in exchange for favorable decisions by KEMP as Treasurer of Philadelphia." The Third Circuit concluded: "These allegations were sufficient to charge [the businessmen] with honest services fraud under a bribery theory . . . ." <u>Id.</u> at 280-81.

In arguing otherwise, Lynch insists that the government was required to explicitly allege a quid pro quo, asserting that Lynch received the cash with the explicit intent to be influenced. He claims that merely "'accepting a payment, knowing that it was intended [by the payor] to influence [the person accepting it],' is not § 1346 bribery." Br. 8 n.7 (quoting Court's statement at plea hearing; bracketed material in original). Lynch is wrong. The Supreme Court itself stated that a quid pro quo exists where "a public official has obtained a payment to which he

was not entitled, knowing that the payment was made in return for official acts."  Evans v. United States, 504 U.S. 255, 268 (1992).  This rule exists because, for purposes of a bribery prosecution, "[t]he quid pro quo can be implicit, that is, a conviction can occur if the Government shows that [the public official] accepted payments or other consideration with the implied understanding that he would perform or not perform an act in his official capacity." United States v. Antico, 275 F.3d 245, 257 (3d Cir. 2001).

The information in this case clearly put Lynch on notice that he was charged with both extant theories of honest services fraud, which led him to insist during the hearing that he was not admitting bribery, and only failure to disclose a conflict of interest.[6]

---

[6] Throughout the proceedings, the government maintained both the bribery and conflict-of-interest theories.  See, e.g., Exh. C at 23 (the prosecutor stated, "The purpose that Mr. Campanella gave this money to Mr. Lynch was as a reward for the assistance that Mr. Lynch had previously provided to Mr. Campanella and also to maintain and continue his relationship with Mr. Lynch when the need for assistance would arise in the future.").  One statement on which Lynch focuses -- "We're not necessarily suggesting that Mr. Lynch would have done something differently, but that he did official actions without disclosing them," id. at 32 -- does not assert differently.  It is no defense to bribery that the public official is not influenced, if he reneges and

The fact that Lynch denied bribery, and resolved to plead only on the basis of the conflict-of-interest theory, as he surely did, see Exh. C (guilty plea colloquy) at 27-35, is not dispositive. As explained above, Lynch now bears the burden to establish that he did not commit bribery or receive a kickback, the theories sustained in Skilling. (Lynch overlooks the kickback theory which retains validity. See, e.g., United States v. Cantrell, 617 F.3d 919, 921 (7th Cir. 2010) (township official who secured contracts for a company owned by an acquaintance, in exchange for a share of the proceeds, "clearly" engaged in a kickback scheme as stated in Skilling).)

---

fails to perform the act, United States v. Brewster, 408 U.S. 501, 526-27 (1972), or even if he does not have the authority at all to do the requested act, United States v. Gjieli, 717 F.2d 968, 973 (6th Cir. 1983) (citing cases from multiple circuits). The offense is proven where, as here, the payor acted with intent to influence the exercise of an official act, and the public official accepts the benefit with knowledge of that intent. Evans, 504 U.S. at 268.

At the guilty plea hearing, once Lynch denied bribery, the prosecutor made clear that the Court could under then-existing law accept the plea based on the conflict-of-interest theory alone. But as explained at length above, that is immaterial to the burden Lynch faces now to gain coram nobis relief.

Lynch cannot sustain that burden on the existing evidence. Campenella gave him a huge amount of cash -- $20,000 -- which both Campenella and Lynch endeavored to conceal. Campenella did so after Lynch had used his official position to help Campenella save many tens of thousands of dollars in taxes and legal fees, and then after Campenella paid the cash Lynch continued to make similar efforts on Campenella's behalf. Such conduct virtually screams bribery, or at the very least, the payment of a kickback of the funds which Lynch saved Campenella. In fact, the government summarized evidence consistent with its bribery theory that during the time period of the payment Campenella talked with his employees about how the taxes on his properties in Philadelphia were a "huge expense" and how he needed to "do something about it," that later advised that his "taxes got lowered" and his "problems were resolved." Exh. B at 4-5. This evidence as well directly supports a bribery charge.

Lynch has to show that, on this record, "it is more likely than not that no reasonable juror would have convicted him" of the valid theory. Bousley, 523 U.S. at

- 29 -

623.  That is impossible.  Accordingly, Lynch cannot sustain his burden of showing actual innocence, and is not entitled to the extraordinary relief of erasure of a settled conviction.

This analysis is consistent with the Third Circuit's approach in an earlier era of coram nobis litigation, which Lynch also does not address, in decisions issued before Bousley and other cases explicated the proper approach.  A bit of history regarding honest services prosecutions is in order.  Prior to 1987, courts interpreting the mail and wire fraud statutes unanimously determined that the right to honest services was a species of intangible property which the statutes protected.  Then, in McNally v. United States, 483 U.S. 350 (1987), the Supreme Court rejected that view, ruling that property which may be the subject of a scheme to defraud is generally limited to money and tangible property.  This provoked a number of coram nobis and other collateral petitions by

defendants who had earlier been convicted of honest services fraud.[7]

Consistent with the argument presented earlier, the Third Circuit denied coram nobis relief in any case in which the evidence demonstrated that the scheme to defraud involved money (the remaining pre-McNally valid theory of mail and wire fraud) and not only honest services fraud (the invalidated theory).  For example, in United States v. Stoneman, 870 F.2d 102 (3d Cir. 1989), the Court denied coram nobis relief, where "the loss of money was implicit in the intangible rights scheme," and "the majority is unable to hypothesize a set of circumstances under which the jury could have found Stoneman guilty of depriving the citizens of the Commonwealth of Pennsylvania of their right to honest government (an impermissible intangible right under McNally) without also having found that Stoneman was involved in a scheme the sole purpose of which was to insure that a

_____

[7]  After McNally, Congress acted with alacrity to enact Section 1346, providing that the fraud statutes applied to the intangible right to honest services.  That set in motion a new generation of honest services prosecutions, and the events which ultimately led to the Supreme Court's Skilling decision interpreting Section 1346.

- 31 -

company known as CTA, Ltd. (CTA) obtained a no-bid Federal

Insurance Contribution Act (FICA) recovery contract at a

substantially greater cost to the Commonwealth of

Pennsylvania than a contract obtained through traditional

competitive bidding." Id. at 104. The Court stated:

> Those substantive errors which result in a person's
> charge and conviction for something not a crime are
> fundamental. In determining what is not a crime,
> authoritative Supreme Court cases are as much a part of
> the law as the statute itself. Hence, when the Supreme
> Court decided in McNally that the statute punished only
> persons who caused tangible loss to victims, that
> requirement became a part of the definition of the
> crime. A person charged in an indictment that did not
> include a loss of tangible rights or convicted by
> evidence that did not show a violation is punished for
> something not a crime and is entitled to collateral
> review.

Id. at 105. However, the Court added, in that case "the

indictment alleges and the evidence introduced by the

government shows that Stoneman schemed to defraud the

Commonwealth of Pennsylvania by securing no-bid FICA

contracts through the bribery of public officials and did,

in fact, cause a money loss to the Commonwealth through such

a scheme." Id. at 106. "Stoneman has not shown fundamental

error and that he has not overcome the presumption that he

was properly convicted of mail fraud, a showing essential to the issuance of a writ of error coram nobis." Id. at 108.

Likewise in this case, where it is undisputed that a businessman paid $20,000 in cash to an official who had helped him avoid taxes and continued thereafter to do so, one cannot "hypothesize a set of circumstances under which" a reasonable jury would find only conflict-of-interest fraud and reject the charge of bribery or kickback. Lynch has not carried his burden of showing a fundamental violation of his rights.

United States v. Martinez, 905 F.2d 709 (3d Cir. 1990), further supports this conclusion. There, the defendant was convicted prior to McNally of defrauding the state of its intangible right to issue a medical license, but the Court of Appeals reversed a grant of coram nobis relief. In Martinez, the government asserted that Martinez was also guilty of a theory which remained valid at the time, that the medical license was tangible property in the hands of the state.[8] In response, the defendant argued

_____

[8] The theory that a license was property in the hands of the state, within the application of the mail and wire fraud statutes, was later itself rejected in Cleveland v.

- 33 -

"that even if we were to hold that a medical license is property in the hands of the state, his original conviction should be overturned because he was tried, indicted and convicted solely on an 'intangible rights' theory."  Indeed, the jury had specifically been instructed that "[t]he object of the scheme need not be money or any form of tangible property."  The Third Circuit responded:

> Assuming arguendo that this portion of the charge was impermissible under <u>McNally</u>, we have repeatedly held that the mere presence of intangible rights theory language in an indictment or jury charge does not in and of itself require the overturning of a previous conviction.  Rather, the decisive factor in these circumstances is whether "the scheme or artifice had the inevitable result of effecting monetary or property losses to the employer or to the state."  <u>United States v. Asher</u>, 854 F.2d 1483, 1494 (3d Cir.1988), <u>cert. denied</u>, 488 U.S. 1029 [] (1989).  Hence, in <u>Asher</u> we upheld a mail fraud conviction, despite an intangible rights theory jury charge, because we were "unable to hypothesize a set of circumstances under which this jury could have found Asher guilty of depriving the citizens of the Commonwealth of their right to honest government . . . without also having found that Asher was involved in a scheme" to deprive the Commonwealth of money.  <u>Id.</u> at 1495.

<u>Martinez</u>, 905 F.2d at 715-16.  The <u>Martinez</u> Court therefore found that, because the defendant did not show he was

---

<u>United States</u>, 531 U.S. 12 (2000), but that development does not affect the <u>Martinez</u> Court's analysis of the availability of coram nobis relief as a doctrinal matter.

innocent under the remaining valid theory, he was not entitled to coram nobis relief.

The decision in <u>United States v. Osser</u>, 864 F.2d 1056 (3d Cir. 1988), was consistent, as the Court once again denied coram nobis relief where an indictment, which presented an intangible rights theory invalidated in <u>McNally</u>, also set forth that the scheme resulted in a monetary loss to a city. (The defendant, a city commissioner, arranged for collusive bids which limited city printing business to two firms, in exchange for "commissions" which were simply kickbacks.)

Like the Third Circuit, the Court of Appeals for the Seventh Circuit (a venue to many corruption prosecutions) was equally firm and vigilant after <u>McNally</u> in restricting coram nobis relief only to petitioners who could establish a manifest injustice. For example, in <u>United States v. Keane</u>, 852 F.2d 199 (7th Cir. 1988), while recognizing that a person who is entirely innocent of a criminal offense should receive coram nobis relief, the court explained that the situation created by <u>McNally</u> (and now by <u>Skilling</u>) is different, where the Supreme Court's

action merely limited the viable theories of guilt.  The

court stated:

> McNally knocked out the prosecution's principal theory
> in Keane's case but does not establish that the
> indictment failed to state an offense.  An indictment
> adverting principally to rights to faithful service
> still may lead to a valid conviction if the prosecution
> shows that the defendant defrauded someone out of
> property, including intangible property.  United States
> v. Wellman, 830 F.2d 1453 (7th Cir.1987).  The
> indictment charges Keane with a scheme that had a
> substantial potential to take other people's property
> by fraud.

Keane, 852 F.2d at 205.  The court therefore denied relief.

> We do not say that Keane's conviction would today be
> affirmed on appeal.  The intangible rights approach was
> such a centerpiece of the trial that it would be
> difficult to conclude, as we did in Wellman, that a
> jury instructed as this one was necessarily found the
> existence of a scheme to defraud someone of "property"
> within the meaning of McNally . . . . As we have
> emphasized, however, and as Keane's lawyer conceded at
> oral argument, if the indictment states an offense,
> that is the end of things for relief in the nature of
> coram nobis.

Keane, 852 F.2d at 205-06.

In advancing our position, we are mindful that the

circuits were split during the post-McNally era in

addressing the availability of coram nobis relief.  In

contrast to the position of the Third and Seventh Circuits

in limiting coram nobis only to cases of actual innocence,

other courts declined to consider whether defendants could have been convicted under a valid theory which was uncharged or not presented to a jury.[9]  <u>See, e.g.</u>, <u>United States v. McClelland</u>,  941 F.2d 999, 1002 (9th Cir. 1991); <u>Allen v. United States</u>, 867 F.2d 969, 972 (6th Cir. 1989); <u>United States v. Mandel</u>, 862 F.2d 1067, 1074 (4th Cir. 1988). These courts focused only on the invalid intangible rights theory presented to juries, and readily granted relief.

But the Third Circuit's view controls here.  Much more aligned with the Third Circuit's carefully circumscribed view of the availability of extraordinary coram nobis relief is the dissenting opinion of Judge K.K. Hall in <u>Mandel</u>.  He stated:

> Unlike the habeas situation where there exists a significant incentive for the government to retry a successful petitioner so that he must serve out his sentence, in the coram nobis context, the likelihood of retrial and the corresponding vindication of society's interest in preserving a valid conviction is greatly diminished.  The government is simply unlikely to allocate its precious prosecutorial resources to retry

---

[9]  The decision in <u>United States v. Sawyer</u>, 239 F.3d 31, 45 (1st Cir. 2001), is consistent with the Third Circuit's view.  There, the court denied coram nobis relief where a new Supreme Court decision affected the theory offered at trial, as the evidence was otherwise sufficient to convict the defendant on valid grounds.

a defendant who will not be resentenced.  Thus, while it is clear that coram nobis and habeas corpus are roughly "similar" proceedings, it is even more clear that the burden on a coram nobis petitioner is, and properly should be, greater than that placed on a habeas petitioner.  Coram nobis petitions that attempt to overturn convictions in which the petitioner has fully and exhaustively litigated his position should be granted only in the most egregious cases, where circumstances make clear that justice cannot tolerate letting the conviction stand.

Id. at 1076-77 (citations and footnote omitted).  Judge Hall

continued:

Neither the majority nor the court below found these theories [of property loss] invalid.  Rather, both ruled that they were not relevant because the jury was not specifically instructed on them.  However, they are relevant, extremely relevant, because this is not a direct appeal.  This is a petition for coram nobis relief.  If either of these theories is valid, which both are, and if there is sufficient evidence to support the verdict, which there clearly is, then the petitioners are guilty of conduct still illegal under the mail fraud statute.  This . . . drastically redirects the analysis necessary to overturn these convictions.  Because petitioners' conduct is still illegal under post-McNally law, they complain merely of the improper instructions given at their trial.

Id. at 1078.

The majority rejects this position, citing this Court's decision in United States v. Alexander, 748 F.2d 185, 189 (4th Cir.1985), which held that when a jury considers alternate theories of liability, we must reverse the convictions if either theory is invalid unless we can say "with a high degree of probability" that the jury did not rely on the invalid theory.  Id. at 189.  I, of course, agree with this proposition and

- 38 -

> agree that in this case, a reviewing court could not
> ascertain with sufficient probability upon which theory
> the jury relied.  However, the tenets of direct
> appellate review do not apply in an identical fashion
> in coram nobis proceedings.  Our role is not to reverse
> these convictions if they are in error, but to overturn
> them only if justice so compels.

Id. at 1078-79.

This analysis was not only consistent with the

nature of coram nobis relief as defined by the Third

Circuit, but was plainly vindicated by the Supreme Court's

later determination in Bousley.  Notably, the premise of the

dissenting circuits -- that fundamental error occurs if a

theory presented to the jury is invalidated, and cannot be

remedied by reference to a valid theory which the defendant

did not admit or a jury did not find -- has been decisively

rejected by the Supreme Court, holding that a habeas

petitioner must show "factual innocence, not mere legal

insufficiency."  Bousley, 523 U.S. at 623.

Therefore, in sum, it is Lynch's burden to

establish that he is innocent of the offense of conviction

under the honest services law as presently defined by the

Supreme Court, and he cannot do so.  He therefore is not

entitled to the extraordinary remedy of coram nobis.

                           Respectfully yours,

                           ZANE DAVID MEMEGER
                           United States Attorney



                           /s Robert A. Zauzmer
                           ROBERT A. ZAUZMER
                           Assistant United States Attorney
                           Chief of Appeals

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

Lisa A. Mathewson, Esq.
123 So. Broad Street, Suite 810
Philadelphia, PA 19109

/s Robert A. Zauzmer
ROBERT A. ZAUZMER
Assistant United States Attorney

DATED: March 3, 2011.